Welcome, Council. This is In Re Fiber-Span, Transit Wireless vs. Fiber-Span, and Transit Wireless vs. Allegheny Casualty. We will go ahead and hear first from Mr. Spang. Thank you, Your Honor. May it please the Court, I am Benjamin Spang from Dilworth-Paxson, represent the appellant, Daniel Straffi, the Chapter 7 trustee for the bankruptcy estate of Fiber-Span Inc. I'd like to reserve three minutes for rebuttal if needed, Your Honor. Okay, that's done. Thank you. So, this case involves questions of acceptance and rejection of commercial equipment arising under the UCC. Now, the result of the bankruptcy court and the Transit Wireless can accept, receive the equipment with full knowledge that does not meet the contractual specifications, take the equipment, install it in the subway system, assert ownership over it, and use it for more than three years to realize substantial revenue. Now, despite that use, the lower courts have held that not only is Fiber-Span not entitled to receive any type of payment for the equipment, but it must also repay Transit Wireless substantial interest on the money that it had already received. Well, let me ask you this, Mr. Spang. There doesn't seem to be any question or dispute that the equipment, as delivered, did not meet the specs, right? It had an excess power draw, and because it had an excess power draw, it had surface temperature issues, and I don't see any dispute in the record about that. Isn't that correct? Well, with the power, you're correct, Your Honor. There is no dispute that the equipment exceeded the maximum power specification. However, with the surface temperature, there is a minor dispute in that the... You could say that it wasn't in their contract, but that was something that the Transit Authority put on them, but the Transit Authority's license, that's what the more... Maybe I should ask it. The more restrictive covenants were the ones that were to govern, right? Correct, and that is for the power specification, not the... Okay, all right. So, even if we were just looking at the power specification, it's undisputed that Fiber-Span delivered a product that did not meet the specs, correct? Correct. Okay, so the question then becomes, what's the consequence of transit accepting delivery, installing, using, and paying over time? And we understand your position to be, well, that's acceptance, and there's no turning back from that, but why don't you help us out and understand whether it wouldn't have been unreasonable to expect transit to take the system offline, risk their entire contract, and have the system crash instead of doing the best they could with unqualified goods, that is, the non-spec compliant goods being just rejected. Help us with that. Absolutely, Your Honor, and in order to get to that analysis, which the district court conducted about a reasonable use, you have to first look at the bankruptcy court's decision regarding the application of UCC section 2-508. That was the argument that Transit Wireless relied upon that there was an offer to cure by Fiber-Span because the appropriate analysis for reasonable use has to begin at the time of rejection, and under Transit Wireless position in the district court's position was that the goods were rejected upon delivery. Now, that's a different analysis as to whether the use is reasonable upon delivery or whether the use is not. Didn't Fiber-Span offer to fix it or remedy the problem? Yes and no, Your Honor. There's a clarification, and the bankruptcy court found that by a preponderance of the evidence, Fiber-Span was not offering to cure. Instead, what Fiber-Span was offering was that they would provide a replacement if Fiber-Span was selected to supply the full build of the subway system. That was what the district or the bankruptcy court found by a preponderance of the evidence. The point that we stress in our brief is that the bankruptcy court then applied the wrong evidentiary standard. The bankruptcy court effectively gave Transit Wireless the benefit of the doubt and again applied what I term a beyond reasonable doubt standard in saying that there was no doubt that Transit Wireless was aware that Fiber-Span was not offering to cure in July of 2012. At that point, because there was no doubt, that's when Transit Wireless had to make the election of whether to accept or reject the goods. That's counter to what the actual findings were where she found that by a preponderance of the evidence, there never was an offer to cure and that that's what she found. The evidence in the record is they repeatedly said, hey, we're going to make this right. You give us the contract for the rest of the build out, we'll replace it with conforming goods. Isn't the record just replete with that in the back and forth? Absolutely, Your Honor. It's replete with references that if you give us the full build, we will replace these items at no charge. That's right. Different than, hey, you're rejecting the goods. Didn't they also try to fix the problem with fans? The fans, Your Honor, was also one of the non-conformities that it was found that the bankruptcy court found why it didn't meet specification. But it was an effort to try to fix the problem. That's why in the beginning of this, I said that the temperature specification is different from the powers. The temperature specification actually met the contractual requirements before the installation of the fans. The temperature demand that transit wireless of 60 degrees Celsius was more restrictive than what was required by the contract. The contract required that the RFNs meet a temperature specification that complied with the UL requirements. And the record indicates that the UL requirements are 70 degrees Celsius and not 60 degrees Celsius. So that's why the fan part of it is kind of a red herring in that the temperature or the temperature specification was met upon delivery. Transit wireless demanded that fiber span reduced the temperature further. And that's what the installations of fans was for. But assume for the sake of discussion that we thought you were right and that there wasn't a rejection, there was an acceptance of the goods. Is this one of those circumstances where you can accept non-conforming goods and then seek damages for breach of the warranty? That is that you are going to get conforming goods? You can seek damages for breach of warranty of what you can prove. That's the issue with the damages. And there was a $66,000 some payment, right? Yes. After the alleged rejection, years after the equipment was delivered, years after it was already determined that fiber span would not be selected for the full build, there was a dispute over who owed who what. That's when fiber span issued the invoice for the initial bill of compensation of $450,000. Ultimately, what transit wireless did is they took final installment payment and removed all of their what they termed breach of warranty damages from the final payment. Now, that's significant. So conceptually, leaving the facts aside, conceptually, under I think it's 2607 of the code, that's an option that transit had, right? They could say, we're accepting the non-conforming goods, but these are non-conforming goods. You're going to pay us the difference between what conforming goods would have given us and what these non-conforming goods are giving us. That was something they could do, correct? Absolutely. And in the end, that would mean you're paying them some damages, right? The damages that they can prove for breach of warranty. Yeah, sure. That's what's required by the code. Upon acceptance, they're limited to breach of warranty damages. Evidence at trial, they only offered evidence of a breach of warranty of the $67,000 that they deducted from the final payment. Okay. We've only got like three minutes left here for you because of your reserve time. And I want to ask you about the IBC, the initial bill compensation. On having acknowledged that they weren't selected for the contract, they had delivered non-conforming goods. How do you get to the place where you can say, oh, you should have paid us? I mean, there's a condition precedent there, isn't there? The condition precedents in the IBC. Well, first off, let me say, the IBC is really a component of the purchase price of the equipment. It was a discount provided for the initial purchase. The conditions precedent that the court ruled were conditions precedents are no more conditions precedent than they are under the UCC. Under the UCC, you're required to provide conforming goods before you're entitled to payment. The IBC is no different in that what's written in order to provide the IBC. It wasn't just that there were non-conforming goods. It was laid out in a way, maybe I read it wrong, but it looked to me like it was laid out in a way that said, if this, then that, if this, then that. Isn't that if then framing of stuff, condition precedent kind of approach to contracting? Well, you have to look at the language. I believe the IBC provision said in order to be entitled to this payment, Fiberspan must deliver goods that conform with the contract and the goods must have been accepted by Transit Wireless. Those are just the regular obligations under the UCC that you have to, they have to be accepted. Well, when you say they're just the regular things, if that's true, then if it's not a condition precedent, it was complete surplusage to say it. I mean, isn't the fact that they said it indicating this is, we're doing something more here in addition to what the UCC requires. We're setting a condition precedent because otherwise there's no purpose in saying it at all. Is there? There is the purpose that it just has to be conforming it. But what you just said, that's what the UCC says. So they added nothing unless they intended to say, this is a condition precedent. If you don't deliver these conforming goods, then you are not entitled to the IBC. How else do you understand that? Unless you just say, they were just talking and saying stuff they didn't have to say. I would agree that it could be conceived as a condition precedent. However, the doctrine of substantive forfeiture would allow the court to excuse those conditions precedent in that the two conditions that they have to be conforming and they have to be accepted or not material conditions in that Fiberspan was able, Fiberspan basically put out about $850,000 of resection development costs. Transit Wireless was able to take that, receive the full benefit of this product. They used it for three years when they were only warranted for two years. And now the result of that is that Fiberspan gets zero. Transit Wireless was able to secure substantial revenue, was able to secure a contract and furthered contract. The disproportionate forfeiture there allows the court to forgive those conditions precedent if they're viewed as conditions precedent. All right. Thank you, Mr. Spang. Mr. Gross, we'll hear from you on behalf of Allegheny Casualty. Thank you. May it please the court. My name is Michael Gross. I'm with the law firm of Saber LLC. We represent Appellant Allegheny Casualty Company. I would like to reserve five minutes of rebuttal time, please. All right. Allegheny seeks review of the portion of the district court's order reversing the bankruptcy court's judgment in favor of Allegheny and against Transit Wireless, which dismissed Transit's action against Allegheny as time barred under the bond's two-year limitations period to file suit. In doing so, the district court ruled that because Transit did not accept the allegedly nonconforming RFN equipment that Fiberspan had delivered, Allegheny is liable under the bond and Transit's suit against Allegheny is not time barred without any discussion by the district court of the date when the bond's two-year limitations period started to run. If we thought that Transit had rejected the goods, if we accept that argument, when do you contend that two-year period began? Our position would be that the two-year period or a claim under the bond would have accrued at the time of rejection because there can only be a claim under the bond if Fiberspan defaults or is found to be materially breached. When specifically did they reject the goods? According to the district court and the record, there were written communications from Transit to Fiberspan in May 2011 and in July 2011 that the district court found constituted rejection of the equipment. That rejection would have been in at the latest July 2011, which was about two months after the equipment was delivered. So that reasoning, the two-year limitations period in the lawsuit would be more out of time than what the bankruptcy court had found, which was that final payment had fallen due upon acceptance, which according to the bankruptcy court was in any further action with respect to the equipment, but the equipment was still in use. Does Allegheny take a position about acceptance versus rejection? Before the bankruptcy court, we found that the court's ruling as to acceptance was logical. Obviously, there was a continued use of the equipment for an extended period of time. And also, Allegheny was not notified about any potential issue until September 2013, which at that point, the equipment had been in use for over two years. So as far as Allegheny is concerned, the bankruptcy court's ruling that there was acceptance is supported by the record. And where did the district court misstep then? When the district court looked at this and said, no, bankruptcy court got it wrong. We're within the two years. Pin for us precisely where you think the district court went off the rails. The district court, my position is that once the district court determined that goods were rejected, that does not automatically result in Allegheny being liable under the bond and transit suit being timely. The district court was required to identify the date when the two year limitations period started to run and when that two year period expired. The district court had to give effect to the bond's two year limitations period, which no one disputed is controlling. The district court even acknowledged that that is controlling. And the contractual payment terms, which according to Allegheny, when final payment fell due, which is what triggers the two year limitations period under the bond, that is set forth in section 13 and the payment milestones, which was three months after delivery of the equipment. No one disputes the delivery. It took place on April 18, 2011. Three months from that date would be June 18, 2011. And that would have triggered when the final payment fell due. And again, that's not to say that the final payment of the full contract case was legally required to be paid by transit to Fiberspan. Why not? Well, again, transit here, transit did withhold 50% of the Fiberspan to take additional steps. So therefore transit made the unilateral decision to withhold final payment. But the final payment could have been zero if transit believed that the goods were not conforming. But that doesn't change when the final payment fell due. Transit and Fiberspan could have changed the date for final payment, but to do so under their agreement under section 71, that would have to be in a writing signed by both parties. There's no such writing in the record. Let's assume for just the sake of discussion, we thought your position was incorrect and that the district court got it right and that there's liability on the bond. You've fought about the interest rate, the New York rate of 9% versus the federal rate. Isn't our law that when we're in diversity or when we're looking at law that applies and there's a choice of law that we apply the state law with respect to pre-judgment interest? Yes, that's correct. And to be clear, Allegheny's argument as to interest is only on the post-judgment interest aspect, not pre-judgment. Okay. So you're acknowledging that the pre-judgment interest has to be at the 9% New York rate? Correct. Correct. Okay. Insofar as the order says that the 9% rate shall apply also to post-judgment interest, we believe that's wrong and post-judgment interest should be at the 9% rate. All right. Mr. Gross, unless there's something else for you to add, you've got five minutes to share with us at the end of all this. All right. I'll wait for the five minutes. I may please the court. I'm Michael Norton from Hand Volition and Associates, and we represent the Appellee Transit Wireless, which also has a cross appeal. On our cross appeal, I would request permission from the court to reserve two minutes for rebuttal. With respect to the issue of rejection, your honor, the courts, both courts below found that transit rejected these goods shortly after they were installed in the subways. Well, when you say both courts below, that didn't look to me like what the bankruptcy court did. You show me where it said the bankruptcy court rejected the goods. The bankruptcy court said that it was unreasonable to expect transit to pay for goods which were nonconforming and had rejected. I will admit, your honor, that in the bankruptcy court's decision, there is some conflicting language, but the bankruptcy court found that the goods as shipped were nonconforming. Indeed. That doesn't mean that they rejected them, and the bankruptcy court's findings of fact seem to indicate that they didn't reject them, that they took them and they used them, and they used them for years, for three plus years, and that transit paid for them, all except a withholding of part of the final payment. That's why it looks like the best you can make out of the bankruptcy court's discussion is that they said maybe there was a period there where it's not really clear whether we're talking acceptance or rejection, some limbo case, but I'm struggling with your assertion that the bankruptcy court found there was a rejection. I'm not seeing it. Well, I'm looking at my notes, your honor, in the joint correspondence from transit advising Fiberspan the RFNs were not compliant with the terms of the agreement and that transit wireless notified Fiberspan in writing that the units were outside the contract specifications. Yeah, nobody's disagreeing with that, Mr. Norton. Nobody at all is disagreeing with that. The question isn't whether the goods were conforming. The question is whether transit accepted the goods despite the non-conformance and then was going to seek its remedies even after acceptance, which they're entitled to do under the UCC, right? I mean, they had, unless I miss my bet, there were basically three options that they had. They could reject it outright. They could accept it outright and later maybe revoke under certain circumstances or they could accept it and then seek damages for the difference. The bankruptcy court looks like they were dealing with this as if it was acceptance. Just for the sake of discussion, assume that we thought that was the case, that there was an acceptance. Where do you go from there? Well, if that's the bankruptcy court's finding a fact, where do you go from there? Well, your honor, I don't believe that the bankruptcy court did find that as a fact, but if they did find it as a fact that they were accepted because of understand delivery, then transit had the right to reject, revoke that rejection once they were evidence of trial and it's in the trial record, a correspondence from transit saying that the goods are not accepted, that they are outside contractual specifications and cannot be deemed to be having been accepted. So we think the record is clear that the district court was correct in finding that the bankruptcy court in fact found that the goods had not been accepted. Now, bankruptcy court later found based on its belief that transit could not continue to believe that fiber span was offering to cure that at that point. Stick with me, stick with me, Mr. Norton on acceptance versus rejection. Doesn't New York law require rejection to be unequivocal? That's the language of the New York cases, right? If you're going to reject goods, the rejection has to be unequivocal, right? I don't think it uses that. The cases that I cite in my brief do not say unequivocal. It says that it has to be understood by both parties that the goods are not accepted. And if the goods have been accepted, you're going to think of it this way. If the goods have been accepted upon delivery and installation, why would fiber span had offered to cure? And why would transit wireless have been attempting to exercise its rights under section 28 of the agreement, which gave it the right to require fiber span to replace non-conforming goods? So you are pushing back on the idea that when New York courts say, quote, it's intent to reject the goods, that's citing Sears versus Roebuck and Aztec technologies. When Sears, the New York state court of appeals says mere complaint about goods does not constitute a clear and unequivocal act of rejection, unquote, you're saying that's not good law. You don't have to make an unequivocal rejection. Oh, no, I'm sorry. I'm not saying that's not I'm saying that transit wireless was very clear with fiber span that the goods were not accepted. They said they were not within contract specifications, but they took them and they installed them and they used them for three years and all that. And they paid for them except for half the last payment. All of that is undisputed, right? Well, they took them. They could not know that the goods were nonconforming unless they were installed. So they cost them six hundred and forty thousand dollars to install the goods. And once they were installed, there was a catastrophic failure of those goods. Well, when you say there was a catastrophic failure, they used them for three years. How catastrophic could it have been? There was a there was a retrofit with the fans, your honor, which allowed the goods to which allowed the units to perform basically. But with considerable problems, considerable, considerable operational problems during the entire time and during that entire time, transit was working with fiber span to replace those goods. So that was not an acceptance that had been an acceptance. There wouldn't have been demands from transit to replace the goods and offers from fiber span to cure. Well, help me understand this. If you believe there had been if that if transit thought it had rejected the goods, then why in July of 2011 did it make half the final payment and then a for nonconforming goods? How does that how does all that add up to rejection? Your honor, under the payment schedule, even before transit received the goods, it had paid 80 percent of the purchase price without knowing that the goods would not work. It had that those were all prepayments made before delivery. So once they were delivered and didn't work, there was a remaining 20 percent payment to be made. OK, how I'm just struggling. I'm struggling, Mr. Norton, to understand a position that says even after we knew and you acknowledge they knew these are nonconforming goods, they continue to use them for years and they continue to pay for them. And then after they make their final payment, they withhold some and say we're keeping this back because of the problems in light of that series of decisions and that behavior. How is that consistent with rejection and a position that we're entitled to get everything back? Well, it's consistent with transit attempting to work with the supplier to have the supplier replace the nonconforming goods. That's what they were attempting to do. They would like July 2013. They knew they were getting conforming goods. They knew that for sure, didn't they? By July of 2013. Yeah. When they make the last piece of the payment and hold back sixty six thousand six hundred bucks and change. Well, it was in July of 2011, I believe, your honor. No, July of 2011. They make the first half of that payment, that last payment. But in July of 2013, they make a payment, which is the rest of it minus sixty six thousand and change, isn't it? I got my facts wrong. I think that's correct. Well, I was focusing on the July 2011 payment when they specifically said on their invoice they will pay the balance, the 10 percent balance when the when conforming goods are when the RFNs are replaced with conforming goods. They did specifically say that to transfer to Fiberspan. Fiberspan did not object to that. They understood that the goods were not conforming and had been and were required to be replaced because under the agreement that transit had with Fiberspan, it had it had the right under section twenty eight to require Fiberspan to replace nonconforming goods. And at all time. Sure. And you have you have a right under the code to post acceptance revocation. And and you've you made it you have it. You may have had a case for that. But if you're going to revoke post acceptance. If then you have to make that revocation within a reasonable time. Right. That's what the code says is three years using something, a reasonable time to say, yeah, we're just we can't deal with this anymore. We're revoking this three years. Do you have any case where somebody gets to use something for three years and then say, I changed my mind? That's not our that's not our position, your honor. Our position is that if if you were to deem that the goods had been accepted upon delivery, just by the mere fact of delivery, then that acceptance was revoked in May of twenty eleven when the goods had that catastrophic failure and that had to be retrofitted with the fans. How can you say it was revoked when they kept using it? That's the that's that's where I'm I'm fighting to get on the same page with you. If you say I revoke, doesn't that mean I give you back your goods? Not I keep using your goods. Well, the supplier has a right to to cure the default. That's what we were trying to do. They were trying to cure those problems with the RFNs and they were promising that they were going to retro first retrofit it with the fans so that they would at least operate that retrofit left the goods still nonconforming. But there was a further requirement and a further promise from Fiberspan that they were going to by November 1st of 2011. That was that was the reason that the that the RFNs remained in the station that Fiberspan was promising it would cure it would it would retrofit it did retrofit that allowed the goods to the RFNs to work, but that they were going to deliver by November 1st of 2011 conforming units that would conform with the specifications of the agreement. So that was why they were left in the station, but that did not deal deal with the bankruptcy courts finding then that at the latest you knew in July of I think 2011 that you weren't getting that. The bankruptcy court said 2012 that we that we should we should have known that Fiberspan was conditioning its offer to cure upon an order for the full build that and that that and that because transit did not move and return the goods at that date that that constituted acceptance. That was the acceptance that the bankruptcy court found. But we found that but the district court is correct that that was legal error because as of July of 2012 we'd paid 90% of the purchase price for those goods. Well hold on when you say that the district court said that was legal error. That's a finding of fact isn't it? Isn't it a factual fact? Isn't acceptance or rejection a question of fact? Yes. Okay so if the bankruptcy court says as a matter of fact you knew I'm saying historically you transit knew when they said to you clearly we're not replacing those things unless we get the final build out order. When they said that to you you knew you weren't getting to get conforming goods. How can the district court override that absence of finding of clear error? Yeah the facts were not overridden. It was the it was the legal conclusion that the bankruptcy court made based on those facts that was legal error. The bankruptcy court found that those facts then meant that because we didn't remove the goods and return the buyers fiber span at that point in time that we would be deemed to have accepted. That was there. Acceptance and rejection are findings of fact. But the legal conclusion that they were drawing about that was incorrect because we had a security interest in those goods and we let's take a real quick do you want to answer anything from Mr. Gross about Allegheny's position before we wrap up your your part of this argument? What's the what's what's your response to his argument that the district court erred because it never identified when the start of the two-year limitations period was? Well they started they did identify we disagree with that start of the two-year limitations period is when payment is due. That's the way the the bond is written. The payment when payment is due that constitutes the commencement of the two-year period. Since the goods were non-conforming and our position your honor is that the goods were not accepted by transit wireless that two-year period had not begun to run as of the date that we filed the action in 2015. So the the time period never was inapplicable because the payment was never due and we cite in our brief I think at page 54 to 55 three or four cases which hold exactly that. How about how about as a matter of fact you made the payments that doesn't matter? No well we didn't make all of the payments your honor and even if we did make the payments they were not famous they were due because they were found to by the bankruptcy court to have to be returned by a fiber span because the there's a breach of warranty and because of breach of contract by supplying non-conforming goods. So it's not due. Due means under the definition normal definition Black's Law Dictionary or Merriam-Webster the owed or owing as a debt the word due always imports a fixed and settled obligation or liability according to Black's Law Dictionary that those payments were never due your honor because the goods that were provided didn't conform to the specifications. So your position is that the two-year deadline never began to run ever? It didn't begin to run and based on the facts in this case because payment did not become due because the goods were non-conforming. So by your logic anytime there's a non-conforming good and there's a bond to secure performance the limitations period will never ever run because by definition there's non-conformance and therefore? The contractual limitations period won't run there's still there is still the you know the legislatively imposed statute of limitations that still applies that and since the and since the purpose of the bond is to secure performance by your logic the bond can never secure performance the bond I mean the there's no maybe I should say this a different way by even though the bond is intended to secure performance and the bond is specifically limited with the statute of limitations that statute of limitations can never operate because by definition the way you look at it the performance didn't happen and therefore non-conformance statute of limitations can never start. Well then I'm having trouble understanding it because the argument you've just made the they negotiated a two-year statute of limitations the two-year statute of limitations is modifying a bond to secure performance and your position is there was non-performance because of non-conformance and therefore the two-year statute of limitations can't ever begin. Did I misunderstand the arc of the reasoning? No the contractual limitations period is inapplicable and it's not expired we've cited case law in New York that supports that this the statute of limitations this you know the actual statute of limitations that the legislature imposed for contract actions that still applies your honor that's six years in New York and then that's the Kasner case we've cited the Kasner case in our brief for that proposition that the the normal statute of limitations would apply that had not run as of the time we brought this action the contractual period two-year period doesn't it's inapplicable because the payment never became due and it didn't become due because of non-conforming goods that's your position I got you I got you why why do you say that acceptance or rejection is relevant at all as I read the contract that payment became due upon delivery of the goods whether they were conforming whether they were accepted they were delivered and payment became due then well it's because that's just the payment schedule your honor and just because there's a payment schedule once there's a breach of the form to make payment is suspended until that breach is cured so the payment didn't become due under standard contract law principles that you're not entitled to payment if you deliver non-conforming goods or you deliver or you don't perform just because there's a payment schedule in a contract if the party doesn't the party that is entitled to payment does not provide the performance required under the contract that suspends the other party's obligation to perform so in this case since fiber span did not supply conforming goods transits obligation to make payment for those goods there's a breach of contract failure to supply conforming goods is a breach of contract under New York law therefore since there was a breach of the contract by fiber span transit's obligation to make payment under the payment schedule was suspended until fiber span cured which it never did and so that's the that's our position concerning why payment was not due and why that payment schedule is irrelevant all right uh judge restrepo or judge porter anything else okay mr norton you got uh two minutes on on your cross appeal when we finish hearing for mr spang and mr gross okay um mr spang you have three minutes and would you please at the outset if you wouldn't mind address whether or not the bankruptcy court your reading of the record on was acceptance or rejection of the goods thank you your honor i think it's pretty clear from the bankruptcy's court uh opinion that there was acceptance that's expressly written in the opinion that if she found that transit wireless accepted the goods in july of 2012 because they continue to use and possess the goods after there was no reasonable doubt that they were aware that fiber span was not offering the cure under section 2508 is that a finding of fact or a question of law acceptance or rejection acceptance versus rejection is a finding of fact that's pretty clear in the case law as far as where we indicate that the bankruptcy court error with that determination was when acceptance was made as i said in my opening under 2508 the bankruptcy court found by a preponderance of the evidence that transit wireless was aware upon delivery that fiber span was not offering cure that's based upon the testimony from transit wireless chief technology officer who indicated that yes they were aware that fiber spans offers were always conditioned upon receipt of an order for a full build that's that's the issue with 2508 um the mr norton raised the uh the contractual requirement to replace the goods that portion of the contract is really immaterial because regardless of whether transit wireless demanded to replace a fire span to replace the goods fiber span never agreed to do so so all that is is a simple breach of contract and their failure to replace the goods is the same breach as the failure to deliver conforming goods it doesn't have any impact on the analysis of acceptance or rejection transit wireless stole received the goods with full knowledge of the only two non-conformities that they were found to be in breach of installed the goods used them for three years that constitutes acceptance pretty clearly and uh the other points uh that i believe your honor has already really addressed them so pending any other questions from any of the the judges i cede my time all right mr gross uh thank you your honor um first off the the bond limitation period the two-year limitation period to file suit um within two years of one final payment of the contract falls due um the bankruptcy court held that was applicable the district court held that was applicable transit even acknowledged in its brief that that provision was applicable so i would say that uh the six-year statute of limitations otherwise applicable to breach of contracting actions does not apply the bonds two-year limitations period applies under new york law parties are allowed to uh shorten uh the limitation period to file suit um here address the specific argument that uh you never had conforming goods delivered has delivered and therefore you never had a circumstance where the the limitations period began to run well your honor first under the yeshiva university case which uh allegheny believes is controlling the court rejected the same final payment never fell due theory as being unenforceable as against public policy um now in in the looking at the contract in the payment terms these terms were negotiated by transit and fiber span they were never changed there are seven installments based upon reaching seven milestones the first is an advanced payment payments two through six are are pre-delivery testing requirements those were all paid in full on time the seventh installment is upon delivery or successful commissioning of the here delivery occurred april 18 2011 it for whatever reason the or i should take that take a step back fiber span and transit wireless they could have negotiated payment terms that had the final payment due after the equipment was installed and it was working uh up to transit standards or the transit authority standards they didn't they could have extended the date final payment fell due if it was determined that upon installation there were some issues the parties could have extended the date when final payment fell due in a writing signed by both of them they did not do that the invoice that mr norton referenced for the seventh and final payment it's invoice 22188 it's appendix page 588 there was handwritten notes on there that it's undisputed those were made by by transit wireless's um vice president of procurement i believe martin black as to a conversation he had with william bain who's transit wireless's cbo that transit was unilaterally making the decision that it was going to withhold half of that final payment until some date on the future as determined by transit wireless that does not extend the the time when final payment fell due under the contract um and then picking up on a question that judge porter asked in terms of acceptance acceptance and rejection of why is this relevant why is it applicable allegheny's position has always been that if the contract is clear final payment uh as to when final payment falls due that's what court um in our view given the back and forth between fiber span and transit wireless and the and the apparent efforts to get to an end result that worked for both sides um took an equitable fair approach and determined that final payment was not due until acceptance which according to reading of it but ultimately still that resulted in transit's suit against allegheny under the bond being barred by several months okay understood judge restrepo or judge porter any questions for mr gross okay mr norton on your cross appeal and once you remind me what precisely is the issue that you cut cross appealed on thank you your honor very narrow issue on cross appeal which is that the um it relates to the bankruptcy court award of damages to transit which included uh six hundred and forty thousand dollars of installation costs that uh which we believe is correct um that the district court reversed that by and disallowed that that those that those particular damages that's six hundred and forty thousand out of the other damages that were affirmed uh we believe this is a legal error transit was entitled to cost as installation costs uh we're didn't the contract specifically say that incidental damages neither party could get incidental damages correct yes and isn't isn't this a classic example of incidental damages that what it costs you to deal with the fallout of the breach not in this case your honor we would argue respectfully because under section 31.3 of the agreement i quote materials or services not meeting the warranties will be replaced repaired or re-performed as applicable at no additional charge to transit and with and will include any de-installation and reinstallation charges so the contract in this case does require fiber span to uh install reinstall uh pick up the cost for reinstallation of uh conforming goods so here uh transit had to pay for installation cost twice once with the fiber span equipment which was uh you know our position is that it was non-conforming and it was rejected and later removed and then had to replace that with a new supplier a cost which duplicated the expense of installation uh of the defective driver's span equipment under this and the district court thought that was incidental right district court thought that was incidental but i think it's because i think it overlooks this section of the uh of the agreement which required uh fiber span to pay for reinstallation uh cost uh and uh in the warranty provision de-installation and reinstallation charges are the obligation of fiber span under the agreement because of the non-conformity in our position uh non-conformity and the rejection of the good so okay that's our that is our cross appeal your honor that that six hundred and forty thousand dollars should be included in the damages and an affirmance of the district court's uh decision okay understood judge restrepo anything for you sir judge porter okay well then we thank all council for their argument today it's been helpful to us we got the matter under advisement uh